IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DAVID E. MILLER,

         OPINION & ORDER

     Plaintiff,

v.              14-cv-361-jdp

DAVID COOPER, THOMAS TALYOR DICKEY,
ELIZABETH THROOP, and DENNIS J. SHIELDS,
in their official and individual capacities,

     Defendants.

---

  This case requires to the court to consider whether it will intervene in the management of a state university's orchestra to protect the rights of an orchestra musician. The musicians in the Symphony Orchestra at the University of Wisconsin—Platteville (UWP) are mostly university students, but community members are also welcome to audition and play. For almost two decades, plaintiff David Miller played the string bass as a volunteer community musician in the UWP orchestra. Miller was dismissed from the orchestra after the fall 2012 semester, and UWP indefinitely banned him from participating in any university ensemble.

  After he was dismissed, Miller petitioned UWP faculty, the university's chancellor, and even Governor Walker for reinstatement. When these efforts failed, Miller hired an attorney, who filed an open records request for records relating to his dismissal. Miller learned that defendants had dismissed him because they had received complaints from female students, who reported that Miller made them uncomfortable by making inappropriate comments and by staring at them during rehearsals.

Miller filed this suit alleging that defendants, the UWP decision-makers in this case, violated his Fourteenth Amendment rights to due process and to equal protection, as well as his First Amendment right to free speech. Both sides have moved for summary judgment. The allegations against Miller were concerning, but not terribly serious, and he is understandably upset that he was not given notice of the allegations or any opportunity to respond. But defendants' actions do not rise to the level of constitutional deprivations, and the court must therefore grant summary judgment to defendants.

UNDISPUTED FACTS

Unless otherwise indicated, the following facts are undisputed.

UWP's Department of Performing and Visual Arts maintains a symphony orchestra, comprised primarily of students who enroll in a corresponding course for credit. Membership in the orchestra is also open to community musicians, who must make a $5 "required donation" to the orchestra program each semester to participate. Community musicians do not sign a written contract to play in the orchestra, although all students and community musicians must complete "placement" auditions every semester. All orchestra members are expected to attend twice-weekly rehearsals throughout the semester, as well as two concerts toward the end of the term.

Miller was born in 1950, and he has been a long-time supporter of and participant in UWP's orchestra. Miller first became involved during high school, when he joined the orchestra as a bass player. Miller was also a member of the orchestra throughout his undergraduate and graduate studies at UWP. He left Platteville to obtain his PhD and pursue his career elsewhere, but he eventually returned in the 1990s, after accepting an appointment

as a lecturer in UWP's Biology Department. Upon his return, Miller rejoined the orchestra. Even after Miller retired from the UWP faculty in 2009, he continued to play bass in the orchestra as a community musician.

In August 2012, UWP hired defendant Thomas Dickey as the Interim Director of the orchestra. Dickey contacted Miller and the other community musicians to introduce himself and to inquire if they anticipated playing in the orchestra for the 2012-13 school year. Miller confirmed that he planned to participate, and he wrote a $20 check to cover his dues for both semesters and to provide an extra donation. For the fall semester, Miller participated in the orchestra as its only string bassist.

Although he performed adequately, the fall 2012 semester was to be Miller's last with the orchestra. On January 25, 2013, defendant David Cooper, the chair of the Department of Performing and Visual Arts, called Miller to inform him that his services would no longer be required. According to Cooper's affidavit, he explained to Miller that there were two new student bassists in the orchestra for the spring 2013 semester.[1] The dismissal came as a surprise to Miller because he had played in the orchestra with as many as five other string bass players at a time. Taken aback, Miller asked if he had done anything wrong. Cooper answered "no," and the call ended. Miller did not ask Cooper to return his donation.

In the month following his dismissal, Miller began a letter-writing campaign. He first wrote to defendant Dennis Shields, UWP's Chancellor, describing his contributions to the orchestra and to the university. Miller indicated that he had formed a contract with UWP by

---

[1] Miller disputes that Cooper specifically mentioned two new bass students. Dkt. 29, at 23. The dispute is immaterial. Miller agrees that Cooper informed him that his "services were no longer necessary," *id.*, and Miller further agrees that there were, in fact, two new bass students who joined the orchestra for the spring 2013 semester, *id.* at 19.

paying his "required donation," and he asked Shields and the university to honor that contract. Miller also wrote to Cooper, expressing the same concerns about a breach of contract. A month later, after these letters went unanswered, Miller wrote to Governor Walker. Miller's letter to the governor alleged that UWP was "engaging in illegal and fraudulent action and in violation of their own contract [as well as] conspiracy to commit fraud." Dkt. 21-1, at 20. Miller intimated that if UWP did not rectify the situation, he would contact newspapers and television stations. Shields, per a request from the governor's office, wrote to Miller on March 19, 2013. Shields's letter explained that UWP was not obligated to retain Miller as a volunteer member of the orchestra and that he stood by the dismissal.

Still eager to participate in the orchestra, Miller decided to try a different approach for the fall 2013 semester; he applied to be a special undergraduate student at UWP so that he could audit Music 1510, the university course that corresponded with the orchestra. Miller's application was accepted, and he paid $361.84 in tuition for the course. The day after Miller enrolled, Dickey checked his class roster for Music 1510 and noticed that Miller would be auditing the course. Dickey immediately contacted Cooper, and the two of them took the issue to defendant Elizabeth Throop, the Dean of the College of Liberal Arts and Education at UWP. Within a week, Throop sent Miller a letter explaining that his enrollment in Music 1510 had been rescinded because of UWP's earlier decision to remove Miller from the orchestra. Throop wrote that Miller was free to enroll in any other courses at the university, but that he would not be allowed to participate in the orchestra or in any other ensemble, either as a student or as a community member. UWP refunded Miller's tuition payment.

At this point, Miller engaged an attorney. Through an open records request, Miller obtained copies of email exchanges between Dickey, Cooper, Throop, and other faculty

4

members at UWP. From these documents, Miller discovered that there was another reason for his dismissal and indefinite ban. During the fall 2012 semester, Dickey learned that Miller was making at least two female students feel so uncomfortable that they were thinking about dropping orchestra. The first student, who ended up leaving the orchestra for an unrelated reason, approached Dickey at the beginning of the semester to report that Miller was making her feel uncomfortable. She did not provide specific examples of misconduct.

Dickey learned of the second student through a colleague, Laura Medisky, a then-faculty member at UWP who gave oboe lessons and taught music appreciation. The student confided in Medisky that Miller had done several things to make her uncomfortable. The first specific incident that the student recounted occurred around Thanksgiving, shortly before an orchestra rehearsal. The student was eating an apple and generally minding her own business when Miller, who had arrived early to orchestra rehearsal, walked up to her. Miller remarked on her choice of fruit, and said "you know what happened to the last young woman who ate an apple?" and walked away.[2] At the next rehearsal, Miller gave the student a red apple and a green apple. The student also reported that when she returned from Thanksgiving break with a new haircut, Miller commented that she looked like she had been through a car wash. Finally, the student complained that Miller stared at her during rehearsals and at a pizza party with the orchestra. The student described these incidents using the terms "harassment," "obsession," and "targeted." Medisky passed the student's complaints on to Dickey, indicating that the student was mortified at the thought of bringing the issue to Cooper's attention or getting Miller in trouble. Medisky also relayed to Dickey conversations that she

---

[2] The student interpreted the comment as a reference to either Eve and the Garden of Eden, or to Snow White.

had with other female students in the orchestra, who agreed that Miller made them uncomfortable.[3]

Earlier in the semester, before the allegedly harassing incidents, Shields had met with UWP faculty and emphasized the importance of treating seriously any harassment or inappropriate behavior directed toward students. Shortly after meeting with the chancellor, Dickey spoke with the community musicians in the orchestra—there were three at the time, including Miller. Dickey explained to them that they needed to be conscious of their behavior toward and around students. The other two community musicians told Dickey afterward that he needed to keep an eye on Miller. The female students' reports of Miller's alleged misconduct quickly followed Dickey's discussion with the community musicians about their behavior. As a result, Dickey contacted Cooper and suggested that they dismiss Miller from the orchestra. Dickey confirmed that there would be new bass students participating in the orchestra for the spring 2013 semester, and so Miller's absence would not be detrimental. In his phone call to Miller on January 25, 2013, Cooper did not discuss any of the female students' allegations.

Miller filed suit in this court under 42 U.S.C. § 1983. He alleged that defendants violated his First Amendment right to free speech by retaliating against him for the comments that he made to the female student, and he alleged that defendants violated his Fourteenth Amendment rights to due process and equal protection by dismissing him without affording him an opportunity to be heard. The court has subject matter jurisdiction

---

[3] Miller disputes that any misconduct occurred, and he contends that there is an innocent explanation for every alleged instance of inappropriate behavior. Miller also objects to the students' verbal complaints of his misconduct as hearsay if offered for their truth. But as Miller concedes, the complaints are *not* hearsay as evidence of what was in defendants' minds when they dismissed Miller from the orchestra. *See* Fed. R. Evid. 801.

pursuant to 28 U.S.C. § 1331, because Miller's claims arise under federal law. Miller seeks summary judgment on all three of his claims, as do defendants.

## ANALYSIS

Miller contends that the court should enter summary judgment on each of his three claims. Defendants disagree, contending that it is *they* who are entitled to summary judgment. Defendants also assert that Miller's claims against them in their individual capacities are barred by the doctrine of qualified immunity. Because the undisputed facts confirm that Miller cannot succeed on any of his claims, the court will enter summary judgment in favor of defendants.

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* A party may not simply rely on the allegations in its pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [its] favor." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996).

The mere presence of cross-motions does not necessarily require the court to grant summary judgment for one party or the other. Instead, the court "look[s] to the burden of proof that each party would bear on an issue of trial; [and] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella*

*v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). Here, Miller will bear the burden at trial on all three of his substantive claims.

With regard to defendants' potential qualified immunity, Miller also bears the burden of "showing that the constitutional right allegedly violated was clearly established at the time of the challenged conduct." *Purvis v. Oest*, 614 F.3d 713, 717 (7th Cir. 2010). Although the court would ordinarily address the question of qualified immunity as a preliminary matter before turning to the merits of a plaintiff's claims, it will not do so in this case. The merits of the case are clearly presented, and decided in defendants' favor, and thus defendants would not be spared any additional burden by the court's consideration of the qualified immunity issue.

### A. Miller's due process claim

Miller alleges that defendants violated his rights by not provided him with notice and an opportunity to be heard before they dismissed him from UWP's orchestra and indefinitely banned him from future participation in any university ensemble. This is a procedural due process claim, and the framework for evaluating it is well established. "To demonstrate a procedural due process violation of a property right, the plaintiff must establish that there is[:] (1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process." *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010) (internal citations and quotation marks omitted). Courts sometimes collapse the second and third inquiries into one element, because the deprivation is typically apparent. *See, e.g., Planned Parenthood of Wis., Inc. v. Van Hollen*, 23 F. Supp. 3d 956, 964 (W.D. Wis. 2014). This case turns on the first element of the framework: whether Miller had a constitutionally protected interest in his participation in UWP's orchestra.

Miller identifies two sources for the property interest that he asserts in this case: the state statute that grants persons age 60 or older the right to audit courses in the University of Wisconsin system; and a contract with UWP entitling him to play in the orchestra as a volunteer member. But because neither source created a constitutionally protected interest, defendants are entitled to summary judgment on Miller's due process claim.

1. **Statutory interest**

We start with Miller's assertion that he holds a constitutionally protected interest by virtue of a Wisconsin statute allowing him to audit university courses. Miller faces an uphill battle because the Seventh Circuit "has rejected the proposition that an individual has a stand-alone property interest in an education at a state university, including a graduate education." *Charleston v. Bd. of Trs. of Univ. of Ill. at Chi.*, 741 F.3d 769, 772 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 2719 (2014). Students are not *constitutionally* entitled to the process protections afforded by policies at state universities. *Id*. at 773. To establish a constitutionally protected interest, Miller must show some legally protected entitlement to his status as a student at UWP. *See id.*

Miller acknowledges that Wisconsin was never constitutionally obligated to extend to its citizens the right to attend public universities, but he contends that the state elected to do so, through Wis. Stat § 36.27. That statute provides that the Board of Regents of the University of Wisconsin System "shall permit a person who is 60 years of age or older to audit a course without paying an auditor's fee if the person is a resident of this state, as determined [by statute], space is available in the course and the instructor approves." Wis. Stat. § 36.27(1)(b). Miller was over the age of 60 when he enrolled as a special student for the fall 2013 semester, and he therefore contends that UWP could not block his

9

enrollment—and cannot block his future enrollments—without affording him at least minimal due process protections.

Miller relies chiefly on *Goss v. Lopez*, 419 U.S. 565 (1975), which held that public high school students could not be suspended without a hearing. But Miller overlooks the substantial differences between the rights of the public high school students in *Goss* and his putative right to audit courses at UWP. *Goss* involved Ohio law, under which all students between the ages of 6 and 21 were entitled to a free public education (and the state had passed a compulsory-attendance law). 419 U.S. at 573. Ohio law provided procedural protections for students facing suspension, and the schools at issue had described the conduct for which suspension could be imposed. *Id.* at 573-74. Notwithstanding these protections, the students in *Goss* were suspended without a hearing. *Id.* at 567. The *Goss* Court held that although Ohio had no constitutional obligation to provide a free education, it had chosen to do so, and so the state could not deprive students of their public education without due process. *Id.* at 574.

The Wisconsin statute on which Miller relies is poles apart from the Ohio public education law. The statute does not give Miller the absolute right to audit classes or to participate in the orchestra. Section 36.27 expressly conditions the right to audit a course on: (1) space for an additional student; and (2) instructor approval. Miller did not satisfy the second condition because Dickey did not approve his enrollment as a special student in Music 1510 for the fall 2013 semester (and he presumably will not approve any enrollment in the future). In *Goss*, the protected interest created by statue—a public education—was unconditional, and the plaintiffs had already established their entitlement to that interest before they were deprived of it. In contrast, however, Wisconsin's statute makes instructor

10

approval a *prerequisite* for auditing a course. Miller does not point to any state law, regulation, or policy that restricts the instructor's discretion to approve or disapprove auditors, and he certainly does not identify a requirement that instructors afford prospective auditors due process protections before withholding permission to audit. The state of Wisconsin has, by statute, extended to its older citizens the opportunity to sit in on state university courses on a space-available basis, subject to instructor approval. It would be an unprecedented and unwarranted intrusion into the life of the classroom if the instructor could be called into federal court to explain his decision to disallow an auditor.

The court concludes that Miller cannot establish a statutorily protected interest that would trigger federal due process protections on the basis of his status as a potential auditor.

### 2. Contractual interest

Miller also argues that he had a constitutionally protected interest in his continued participation in the orchestra based on a contractual right. "As a general matter, a contract with a state agency may give rise to a protected property interest." *Sung Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 831 (7th Cir. 2012). But Miller has to adduce evidence of a specific contractual right that creates an interest in his continued participation in the orchestra. Even if he had been a student, an "interest in contractually-guaranteed university process is *not* protected by the federal Constitution." *Id.* at 832 (emphasis added); *see also Charleston*, 741 F.3d at 769 ("We have rejected similar claims of an interest in contractually-guaranteed university process many times . . . but we will be clear once more: a plaintiff does not have a federal constitutional right to state-mandated process.") (internal citations and quotation marks omitted). Thus, it is not enough for Miller to show that students would have the right to a fair process before being dismissed from the orchestra.

11

Miller offers three ways in which he had a contract to play in the orchestra: (1) UWP's "general offer to all members of the public that Orchestra is open to them if they pass an audition and pay the required fee;" (2) a "statutory promise that residents over the age of 60 could take the class for free if not seeking a degree and not displacing a student;" and (3) "Cooper's specific, verbal offer to [Miller], asking him to return for the 2012-2013 school year." Dkt. 11, at 17.[4]

It is not enough for Miller to show that he had some sort of contract; Miller must identify a contractual promise "that entitled [him] to a specific right, such as the right to a continuing education or the right not to be suspended without good cause." *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 601 (7th Cir. 2009). Thus, even assuming that Miller's arrangement with the orchestra was somehow contractual, his due process claim would still fail because Miller has not adduced evidence that defendants made a contractual promise that he would not be dismissed without good cause.

Miller must concede that he never signed a written contract to participate in UWP's orchestra. Dkt. 29, at 14. But he compares this case to *Bissessur*, and to *Williams v. Wendler*, 530 F.3d 584, 589 (7th Cir. 2008), both cases in which the Seventh Circuit noted that students could establish implied contracts with universities that entitled them to not be suspended without good cause. Miller argues that the sections of Wisconsin's Administrative Code governing procedures for nonacademic student discipline were "implicit in [his]

---

[4] Miller also hints, in a footnote, that "[t]here is an argument that a contract may be created and evidenced by the conduct of the parties . . . as Dr. Miller had taken Orchestra for 17 straight years." Dkt. 11, at 17 n.4 (internal citations omitted). But if there was an argument to make, Miller should have made it. His failure to develop this point beyond a single sentence in a footnote constitutes waiver. *Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Exp., Inc.*, 181 F.3d 799, 808 (7th Cir. 1999) ("Arguments not developed in any meaningful way are waived.").

contractual relationship" with defendants. Dkt. 11, at 19. But Miller does not identify a promise from defendants that even mentions these provisions, let alone one that implies that he would be treated as a "student" for purposes of discipline. *See, e.g.*, Wis. Admin. Code UWS § 17.09 ("[T]he university may discipline a *student* for engaging in, attempting to engage in, or assisting others to engage in any of the following types of nonacademic conduct.") (emphasis added).

Dickey never promised Miller that he would not be dismissed absent good cause. And the fall 2012 and spring 2013 syllabi for Music 1510 do not mention dismissal or any provision of the administrative code. *See generally* Dkt. 14-10, at 5-12. Even the preceding semester's syllabus—which is not applicable in this case—provides only that "[c]ommunity members must also *be aware of* the same USO policies and procedures as expected of UW-Platteville students." *Id.* at 1. It does not indicate that community musicians can expect to receive those procedures if they engage in misconduct. Defendants do not dispute that special students—*i.e.*, those auditing a course pursuant to § 36.27—are held to the same code of conduct as regular students. Dkt. 19, at 13. But this point is irrelevant because Miller was not enrolled as a special student when he was dismissed; he was a volunteer community musician. Thus, Miller has not adduced evidence of any promise, express or implied, that defendants would treat him as a student for disciplinary purposes during the 2012-13 school year, or that they would not dismiss him from the orchestra without good cause.

As a last resort, Miller asserts that all contracts implicitly include the right to be free from arbitrary dismissal. Dkt. 11, at 19. This cannot be right; most employment contracts in Wisconsin provide for at-will employment that can be terminated arbitrarily. *Vorwald v. Sch. Dist. of River Falls*, 167 Wis. 2d 549, 482 N.W.2d 93, 96 (1992) (cited with approval by

*Carroll v. Stryker Corp.*, 670 F. Supp. 2d 891, 899 (W.D. Wis. 2009), *aff'd*, 658 F.3d 675 (7th Cir. 2011)). The two Wisconsin cases that Miller cites do not create a right against arbitrary terminations. *See Beidel v. Sideline Software, Inc.*, 2013 WI 56, 348 Wis. 2d 360, 842 N.W.2d 240 (dispute between a minority shareholder and his company concerning a stock-repurchase agreement); *Anderson v. Cont'l Ins. Co.*, 85 Wis. 2d 675, 271 N.W.2d 368 (1978) (insured's tort action against his insurer for a bad faith refusal to honor a claim). It is true that Wisconsin contracts imply a duty of good faith and fair dealing, but this abstract duty cannot give rise to a constitutionally protected property interest. If it did, then virtually every university student would have a constitutionally protected interest in fair treatment just by virtue of paying tuition.

Stripped to its essence, Miller's challenge in this case is that he did not receive the process afforded to UWP's students before he was dismissed from the orchestra. This is exactly the type of due process claim that the Seventh Circuit has precluded. *Charleston*, 741 F.3d at 769; *Sung Park*, 692 F.3d at 832. Miller alleges that he was deprived of his "right" to disciplinary procedures from UWP, a right that is not constitutionally protected under the Due Process Clause, and a right that was not afforded to him as a volunteer member of the orchestra. Defendants are entitled to summary judgment on Miller's due process claim.

### B. Miller's retaliation claim

Miller next claims that defendants violated his First Amendment right to freedom of speech when they retaliated against him for the comments that he made to a female student. To succeed on a retaliation claim, Miller must establish that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a

"motivating factor" in defendants' decision to dismiss and indefinitely ban him from UWP's orchestra. *Redd v. Nolan*, 663 F.3d 287, 294 (7th Cir. 2011). Miller cannot proceed beyond the first step of this inquiry because his speech was not constitutionally protected.

Miller contends that because defendants took action against him based on his speech in an educational setting, the principles in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), provide the analytical framework for his First Amendment claim. Under *Tinker*, students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," but educators can restrict speech that will cause a material and substantial disruption of the work and discipline of the school. 393 U.S. at 506, 509.

But *Tinker* does not provide the appropriate analytical framework, primarily because Miller was not a student. He was a volunteer participant in the orchestra. Miller did not receive a grade for participating in the orchestra, or even academic credit, and he was not enrolled in and pursuing a degree at UWP at the time he made his comments. The syllabus for Music 1510 distinguished between students and community musicians. *See* Dkt. 14-10, at 5, 9 ("Open to all university students *and* area musicians.") (emphasis added). And Dickey's special meeting with the community musicians in November 2012 confirmed that he did not regard them as students. *See* Dkt. 23, ¶ 13 ("I met with the community members of the orchestra . . . and advised them that because they participate in a student organization/class, they must be highly conscious of their behavior, actions and words around students."). Even if *Tinker* did provide the appropriate framework, defendants reasonably predicted a material and substantial disruption of the operation of the orchestra because the complaining female students said that they were considering quitting the orchestra because of Miller's conduct.

15

*Tinker* also recognizes that student speech that invades the rights of others is not immunized by the First Amendment. 393 U.S. at 512.

Although the events at issue took place under the auspices of a state university, the undisputed facts show that Miller's role in the orchestra was more analogous to an employee than to a student. Miller voluntarily participated in a public organization. By his own account, he provided the orchestra with a valuable service, as he was the only bass player during the fall 2012 semester. Accordingly, a more apt analytical framework is provided by First Amendment retaliation claims by public employees. Like any public employer, UWP must be accorded considerable discretion to manage the community musicians who participated in its orchestra. And, like a public employee, Miller must recognize that his participation in the orchestra necessarily involves some curtailment of what he could do and say. *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) ("When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."). Indeed, the Seventh Circuit has applied principles from the public employment context to situations where non-student adult volunteers enter the school setting. *See, e.g., Mosely v. Bd. of Educ. of Chi.*, 434 F.3d 527, 534 (7th Cir. 2006) (parent volunteer chairperson of school committee treated as a public employee for purposes of her First Amendment claim against the school board). The court therefore concludes that the public employment framework is analogous to Miller's situation, and the principles of that framework govern his First Amendment claim.

In the context of public employment, the First Amendment does not protect casual, idle, or flirtatious chit-chat. *Trejo v. Shoben*, 319 F.3d 878, 887 (7th Cir. 2003). As the Seventh Circuit has explained:

16

> The purpose of the free-speech clause and of its judge-made corollary the right of association is to protect the market in ideas . . . broadly understood as the public expression of ideas, narratives, concepts, imagery, opinions—scientific, political, or aesthetic—to an audience whom the speaker seeks to inform, edify, or entertain. Casual chit-chat between two persons or otherwise confined to a small social group is unrelated, or largely so, to that marketplace, and is not protected. Such conversation is important to its participants but not to the advancement of knowledge, the transformation of taste, political change, cultural expression, and the other objectives, values, and consequences of the speech that is protected by the First Amendment.

*Swank v. Smart*, 898 F.2d 1247, 1250-51 (7th Cir. 1990) (internal citations omitted). "Chit-chat" is exactly what occurred in this case. Miller's own recollection of the apple incident confirms that he was not expressing an idea, concept, imagery, or opinion. Quite the opposite; he and a female student happened to both be early to rehearsal, and when she commented that she loved apples, he "jokingly replied with a humorous comment." Dkt. 13, ¶ 22. "No other words were exchanged, and [Miller and the student] went on preparing for rehearsal." *Id.* Miller would have been free to make such comments to a person he saw in a coffee shop, where the other party would have been free to walk away. But in the context of the UWP orchestra, Miller's contribution to this brief exchange, and the disquieting effect that it had on the female student, are not entitled to constitutional protection. Because the undisputed facts confirm that Miller did not engage in protected speech or conduct, defendants are entitled to summary judgment on his First Amendment claim.

## C.  Miller's equal protection claim

Miller cannot succeed on his claim that defendants' actions in this case were so lacking in justification as to have violated the Equal Protection Clause. To prove his "class of one" equal protection claim, Miller must show that he was "intentionally treated differently from others similarly situated and that there [was] no rational basis for the difference in

treatment." *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 685 (7th Cir. 2013), *cert. denied,* 134 S. Ct. 1308 (2014). Miller has not adduced evidence from which a reasonable jury could conclude that there was no rational basis for dismissing and indefinitely banning him from the orchestra.

At trial, Miller would bear a heavy burden to show that defendants lacked a rational basis for their decisions. "The rational-basis requirement sets the legal bar low and simply requires a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* at 686. "A given action can have a rational basis and be a perfectly logical action for a government entity to take even if there are facts casting it as one taken out of animosity." *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 547 (7th Cir. 2008). Thus, the burden is on Miller "to eliminate *any* reasonably conceivable state of facts that could provide a rational basis for the classification." *Kopp*, 725 F.3d at 686 (emphasis added). The undisputed facts show that defendants had a logical reason for dismissing him from the orchestra and for making the dismissal permanent, and thus Miller cannot sustain his burden.

The evidence of record establishes that defendants received complaints about Miller from at least two female students. One student approached a member of UWP's faculty in tears, confiding that she was considering dropping orchestra. The faculty member reported to Dickey that the student used the words "harassment," "obsession," and "targeted." A few weeks before, when Dickey met with the community musicians in the orchestra and explained that Shields had recently cautioned UWP faculty to be wary of harassment toward students, two of them expressly warned him to keep an eye on Miller.[5] In his email messages

---

[5] The court emphasizes that much of this evidence would be inadmissible to prove that Miller engaged in misconduct. But the evidence *is* admissible to prove what was in Dickey's mind when he decided to dismiss Miller from the orchestra.

to other defendants, Dickey explained that he was concerned about orchestra students feeling uncomfortable because Miller did not know "the boundaries of socially acceptable and appropriate behaviors." Dkt. 22-1, at 2. Dismissal was not the only reasonable response to these reports, but it was certainly a rational response. And an indefinite ban, while harsh, was also rational.

Miller insists that defendants' conduct in this case was "absurd," such that they must have acted out of animosity. For example, Miller observes that defendants waited to dismiss him until a month and a half after Dickey's December 4, 2012, email to Cooper regarding his concerns, and that defendants could have easily afforded him a brief opportunity to respond to the allegations against him. But "the test for rationality does not ask whether the benign justification was the *actual* justification. All it takes to defeat the plaintiffs' claim is a *conceivable* rational basis for the difference in treatment." *Kopp*, 725 F.3d at 686 (original emphasis). Thus, it does not matter that defendants failed to perform an exhaustive investigation into the allegations against Miller, nor was it irrational to provide him with a different, but true, reason for dismissing him. On the record before the court, it might have been more reasonable for defendants to inform Miller that his conduct was unacceptable and to give him a chance to respond, and perhaps a chance to reform his conduct. But no reasonable jury could conclude that defendants lacked any rational basis for dismissing Miller and indefinitely banning him from participation in the orchestra. Defendants are therefore entitled to summary judgment on Miller's equal protection claim.

ORDER

IT IS ORDERED that:

1. Plaintiff David Miller's motion for summary judgment, Dkt. 10, is DENIED.

2. Defendants David Cooper, Thomas Dickey, Elizabeth Throop, and Dennis Shields's motion for summary judgment, Dkt. 17, is GRANTED.

3. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered July 2, 2015.

                        BY THE COURT:

                        /s/

                        _____
                        JAMES D. PETERSON
                        District Judge